**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SAMMIE RAINEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **16 CV 6358** |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **NANCY A. BERRYHILL, Acting** | ) | |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Sammie Rainey ("Claimant") seeks judicial review under 42 U.S.C. § 405(g) of a final decision of Defendant, the Commissioner of the Social Security Administration, denying his claim for Social Security Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI"). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Claimant's motion for summary judgment [15] is denied and the Commissioner's motion for summary judgment is [24] granted.

## I. BACKGROUND

### A. Procedural History

On September 26, 2011, Claimant filed a Title II DIB application and a Title XVI SSI application, alleging a disability onset date of September 4, 2011, due to complications related to a stroke, among other problems. (R. 168-80.) His initial claims were denied on May 4, 2012, and again upon reconsideration on November 13, 2012.

---

[1] Nancy A. Berryhill is substituted for her predecessor, Carolyn W. Colvin, pursuant to Federal Rule of Civil Procedure 25(d).

(R. 110-23.)  After both denials, Claimant filed a hearing request, and a hearing was held before an Administrative Law Judge ("ALJ") on May 22, 2014.  (R. 45-99.)  Claimant appeared along with his attorney.  A vocational expert and medical expert were also present and offered testimony.  On September 24, 2014, the ALJ issued a written decision denying Claimant's applications for DIB and SSI.  (R. 21-33.)  Claimant then requested review by the Appeals Council.  On April 30, 2016, the Appeals Council denied his request for review, at which time the ALJ's decision became the final decision of the Commissioner.  (R. 1-6); *Zurawski v. Halter*, 245 F.3d 881, 883 (7th Cir. 2001).  This action followed.

## B.    Medical Evidence

### 1.    Treating Physicians

Records dating back to March 2009 reveal that Claimant was admitted to St. Bernard Hospital after complaints of persistent left sided weakness and balance problems.  (R. 419.)  He reported a history of high blood pressure.  (*Id.*)  Upon admission, his blood pressure was 199/128 and he exhibited a minimal right facial droop.  (*Id.*)  A chest x-ray was normal and a CT scan of the head was negative, with no bleed observed.  (R. 420.)  An EKG showed regular sinus rhythm, with left ventricular hypertrophy.  (*Id.*)  A Doppler study revealed no significant abnormalities.  (R. 431.)  The examining physician upon admission assessed new onset cerebrovascular accident ("CVA"), or stroke, and uncontrolled hypertension.  (R. 420.)  A subsequent physical examination revealed no neurological deficits, normal grip in the upper extremities, and normal strength in the lower extremities.  (R. 422.)  That examining physician assessed a transient ischemic attack, or a "mini-stroke."  (R. 422.)

The record is then silent until Claimant presented to Holy Cross Hospital on September 4, 2011 after he felt sudden right sided tingling and numbness, and an unsteady gait while working as a CTA bus driver. (R. 278, 294.) Upon admission, Claimant's blood pressure was elevated at 180/110. (R. 294.) His initial neurological and musculoskeletal exams were normal. (R. 279.) He reported a history of hypertension and a stroke two years prior. (R. 294.) He had not been taking his blood pressure medication for several weeks. (*Id.*) Claimant admitted to smoking half a pack of cigarettes per day. (*Id.*) Upon physical examination, attending physician Dr. Gregorio Rosenstein noted elevated blood pressure, but otherwise primarily normal results. (*Id.*) Dr. Rosenstein initially assessed severe hypertension, coronary artery disease, and hyperlipidemia. (R. 294-95.) Claimant was started on additional medications and admitted for further testing. (*Id.*)

By the time of his neurological consultation the day after admission, Claimant was neurologically stable, and showed no cardiac, respiratory, or abdominal symptoms. (R. 270.) An MRI of the brain did show evidence of "acute infarct in the left putamen," as well as evidence of "an old infarct in the left internal capsule." (R. 297.) An echocardiogram revealed mild left ventricular hypertrophy and stage 1 diastolic dysfunction. (R. 268-69.) A chest x-ray and carotid Doppler ultrasound were unremarkable. (R. 298, 300.) Over his four day admission, Claimant's blood pressure was stabilized, and he remained on multiple medications with successful control of his blood pressure. (R. 272.) Ultimately, Claimant was discharged on September 7, 2011 with the following diagnoses: accelerated hypertension, hyperlipidemia, and cerebrovascular accident. (*Id.*) Dr. Rosenstein's discharge summary makes no

mention of the need for a cane.  (*Id.*)  In fact, at discharge, it was noted that he was able to ambulate independently.  (R. 388.)  Claimant was advised to engage in activity as tolerated, stop smoking, and follow-up with Dr. Rosenstein.  (R. 389-390.)

Claimant followed-up with Dr. Rosenstein a few days later on September 9, 2011.  (R. 351.)  His blood pressure was better controlled at 138/80.  (*Id.*)  The following week, Claimant returned for re-fills of his medication.  (R. 350.)  He reported occasional blurred vision.  (*Id.*)  Dr. Rosenstein recommended that Claimant avoid tobacco.  (*Id.*)

Claimant returned to see Dr. Rosenstein on January 13, 2012.  (R. 349.)  In the section titled "HPI," or history of present illness, Dr. Rosenstein noted that Claimant "is not able to go to work due to poor vision and needs medication refills."  (*Id.*)  Claimant's blood pressure was 140/86.  (*Id.*)  Upon physical examination, Dr. Rosenstein appeared to note decreased vision, without specific testing results, but no other abnormal findings. (*Id.*)  Dr. Rosenstein referred Claimant for a consultation with an eye doctor.  (*Id.*)

On February 3, 2012, Claimant saw Dr. Linas Sidrys for an ophthalmological evaluation.  (R. 308-14.)  Claimant was farsighted in both eyes, but demonstrated 20/20 visual acuity with best correction.  (R. 308-09.)  According to Dr. Sidrys, with his reading glasses, Claimant would have no work-related limitations due to visual impairments.  (R. 311.)

In October 2012, Claimant presented to Dr. Sophia Chin to establish care and for medication refills.  (R. 407.)  He reported he had been taking Diovan for hypertension and had quit smoking over the past week.  (*Id.*)  Dr. Chin's review of systems and physical examination were essentially normal apart from elevated blood pressure at 154/105.  (R. 408.)  Dr. Chin described Claimant as an "ambulant male – general

4

condition stable – walks with cane." (*Id.*)  However, she noted a "normal gait," normal sensory and motor functions, and no focal defects.  (R. 409.)  Dr. Chin assessed hypertension, for which she prescribed medication, and status post CVA.  (*Id.*)  She recommended a low sodium diet, exercise, and no smoking.  (*Id.*)  Claimant was directed to follow-up in a few weeks for the results of various lab testing.  (*Id.*)

Claimant returned as directed, but reported he had not yet started some of the medications prescribed.  (R. 403.)  He had not smoked for a month.  (*Id.*)  His blood pressure was 148/103, but the physical exam was otherwise unremarkable.  (R. 405.)  Claimant's hemoglobin was elevated and further lab work was ordered.  (R. 406.)  He was instructed to return in three weeks, though the record does not indicate that he did so.  (*Id.*)

The record includes discharge papers dated April 2013 from an admission at Ingalls Memorial Hospital, but additional records from that admission were not provided.  (R. 413-16.)  Though the reasons for his admission are unclear, the discharge instructions appear to address heart related problems.  (*Id.*)

A month after his administrative hearing, Claimant returned to see Dr. Rosenstein on June 23, 2014, complaining of pain in his hip joint and weakness on the right side.  (R. 418.)  He said his cane had been helping.  (*Id.*)  His blood pressure was 165/105.  (*Id.*)  Dr. Rosenstein commented he was "limping when ambulating."  (*Id.*)  Dr. Rosenstein also noted decreased strength of the extremities, without further elaboration, and recommended Claimant continue to use the cane.  (*Id.*)  A note dated the same day from Dr. Rosenstein states that Claimant "is in need to use a cane to ambulate due to a stroke since 9-11-2011."  (R. 417.)

### 2.    Agency Physicians

On February 21, 2012, Dr. James Hinchen completed a Residual Functional Capacity ("RFC") Assessment.  (R. 315-22.)  According to Dr. Hinchen, Claimant could occasionally lift and/or carry twenty pounds, frequently ten; could stand and/or walk six hours in an eight-hour workday; sit for six hours; and had an unlimited ability to push or pull.  (R. 316.)  Dr. Hinchen briefly acknowledged Claimant's complaints of blurred vision, but found no visual limitations, or any other postural, manipulative, communicative, or environmental limitations.  (R. 316-19.)  In his summary assessment, Dr. Hinchen reviewed Claimant's 2011 Holy Cross admission records, the follow-ups with Dr. Rosenstein, the eye consultation with Dr. Sidrys, and Claimant's reported activities of daily living, including taking a walk every morning, preparing meals, doing chores, and using public transportation.  (R. 322.)  He found Claimant's symptoms only "partially credible" as "all body systems are normal including visual acuity."  (*Id.*)

Shortly after Dr. Hinchen's review, a few other agency specialists appeared to review the records and the RFC assessment.  (R. 323-27.)  Dr. Darrell Caudill opined that the impairments of coronary artery disease and heart failure were non-severe in light of the medical evidence of record.  (R. 323.)  Dr. Ramona Minnis noted the absence of current neurological records, and recommended follow-up in this regard to determine if Claimant remained neurologically intact following his 2011 stroke.  (R. 324.)  Dr. Joan Humphreys agreed that Claimant exhibited no RFC limitations based on vision.  (R. 325-27.)  A "Request for Corrective Action" from the Atlanta Disability Quality Branch dated March 20, 2012 also recommended further physical examination of Claimant's neurological impairments, if any, following his 2011 stroke.  (R. 225-28.)

On April 10, 2012, Claimant underwent a consultative examination with Dr. Fauzia Rana. (R. 330-38.) Claimant described a history of stroke in 2011, but said that his condition had improved since then. (R. 330.) He stated that he still feels weak on the right side and feels off balance at times. (*Id.*) As a result, he uses a cane "most of the time." (*Id.*) He said that he could usually walk up to two blocks. (*Id.*) Claimant further described his history of hypertension, for which he takes medication. (*Id.*) He denied chest pains. (*Id.*)

Dr. Rana generally described Claimant as having "no difficulty in breathing and no difficulty in any movement." (R. 330.) Upon physical examination, his blood pressure was 140/11. (*Id.*) For the most part, Dr. Rana's examination was otherwise unremarkable. (R. 331-32.) A Snellen test of the eyes revealed uncorrected vision of 20/30 on the right and 20/20 on the left, and he did not have glasses at that time. (R. 331.) A cardiovascular exam was normal. (*Id.*)

Dr. Rana saw no abnormalities of the upper extremities and Claimant exhibited full range of motion in the shoulders, elbows, and wrists. (*Id.*) Grip strength was 5/5 bilaterally. (*Id.*) Muscle strength was 5/5 on the left and 4-5/5 on the right. (*Id.*) Claimant had no limitations in fine or gross manipulation on either side. (*Id.*) As for the lower extremities, Claimant had full range of motion in the ankles, knees, and hips. (R. 331.) Straight leg raise was negative bilaterally. (R. 331-32.) Muscle strength was 5/5 on the left and 4-5/5 on the right. (R. 332.) Claimant had no difficulty getting on or off the exam table, tandem walking, walking on his toes or heels, squatting and rising, or hopping on one leg. (*Id.*) Though Claimant had a cane with him at the exam, he exhibited a normal gait without limping or staggering and was able to walk more than 50

feet without the cane. (*Id.*) Claimant had full range of motion in the spine. (*Id.*) The neurological exam yielded normal results. (*Id.*) Dr. Rana assessed poorly controlled high blood pressure with no evidence of congestive heart failure, and "Status post CVA" with no significant focal neurological deficit." (*Id.*) According to Dr. Rana, Claimant "is able to sit, stand, walk, lift, carry, speak, and hear without difficulty." (R. 333.)

On April 25, 2012, Dr. Hinchen completed a second RFC assessment. (R. 339-46.) He again concluded that Claimant could lift and carry twenty pounds occasionally, ten pounds frequently; could stand and/or walk for six hours in an eight-hour day; could sit for six hours; and had an unlimited ability to push or pull. (R. 340.) He acknowledged Claimant's complaints of feeling off balance, but noted that he was able to walk fifty feet without his cane at the consultative exam. (*Id.*) He identified no other postural, manipulative, visual, communicative, or environmental limitations. (R. 341-43.) According to Dr. Hinchen, the suggestion by Dr. Rosenstein that Claimant could not return to work as of January 13, 2012 due to blurry vision was not supported by the evidence. (R. 345.) In support of his findings, Dr. Hinchen again summarized Claimant's medical records and reviewed the seemingly normal results of the recent consultative examination. (R. 346.) The RFC assessment was affirmed on November 8, 2012, and again on February 13, 2013. (R. 352-54, 356.)

### C.    Hearing Testimony

#### 1.    Claimant's Testimony

Claimant appeared at the hearing with counsel and testified as follows. He was sixty years old at the time, had a high school diploma, and had been living with various

relatives and friends since becoming homeless in 2012. (R. 50-51.) His driver's license is expired. (R. 52.) He traveled to the hearing by bus. (*Id.*)

Claimant explained that he last worked as a CTA bus driver in September 2011, a position he held for eleven years. (R. 53.) After his 2011 stroke, Claimant attempted to go back to work at the CTA because his doctor had released him to work. (R. 56-57.) But, after the CTA sent him for a medical consultation, he was told he could no longer work at the CTA due to his stroke. (R. 57.) From late 2000-2001, Claimant worked for about a year at the post office as a mail handler unloading trucks. (R. 70.) In that position, he regularly lifted more than fifty pounds and was standing and walking most of the day. (R. 90.) Prior to his position at the post office, Claimant worked in the switchboard room at a hospital, where he was responsible for handling and routing the calls that came into the hospital. (R. 53-54.) Training for that position took about thirty days and he was not required to walk around or do any heavy lifting. (R. 55.) At times, he went to different areas of the hospital to plug in a phone. (R. 68.) According to Claimant, he could no longer perform his switchboard operator position because the system was different and he could no longer type as well with his right hand. (R. 67.)

Claimant testified that following his 2011 stroke, he has had problems with balancing and weakness on the right side of his body. (R. 57.) He reported no problems with his left side. (*Id.*) Claimant testified that he has difficulty standing up or walking without his cane, and can only walk about fifty or so feet without his cane. (R. 58-59.) When walking without his cane, he "drifts" to one side, and he also has to take his time climbing stairs. (R. 63.) He has fallen on a couple of occasions. (R. 58.) He testified that he can lift and carry no more than five to ten pounds due to weakness on

his right side.  (*Id.*)  He can dress himself, though it takes time.  (R. 59.)  He said that he was not currently under any restrictions from his treating physicians in terms of activities.  (R. 59.)

After his stroke, Claimant participated in physical therapy through the CTA for a very short period.  (R. 63-64.)  At the time of the hearing, he was not undergoing any formal physical therapy, but said he was "doing it [him]self."  (R. 63.)  He was taking Diovan and aspirin for his high blood pressure when he could afford it.  (R. 64-65.)  He explained that he just received his County medical card that would allow him to fill his prescriptions through the County medical system.  (R. 65.)

On a typical day, Claimant watches television and sometimes tries to get out for some fresh air by taking a walk around the block with his cane.  (R. 59-60.)  If he needs to grocery shop, he takes someone with him to load and unload the cart.  (R. 60.)  He sometimes prepares his own meals.  (R. 63.)

### 2.    Medical Expert's Testimony

A medical expert ("ME") testified at the hearing as well.  The ME first asked Claimant when it became "necessary" for him to use his cane, and the Claimant responded that he started using his cane when he was released from the hospital after his 2011 stroke.  (R. 76.)  Claimant also explained that he is not in pain, but relies on the cane for balance and coordination.  (R. 77, 80.)

Next, the ALJ asked the ME to identify Claimant's medically determinable impairments as established by the medical records.  (R. 80.)  The ME explained that Claimant suffers from poorly controlled hypertension, with some compliance problems, and a "history of lacunar infarct on the left side and right containment infarct on the

right." (R. 80-81.)  The ME was of the opinion that Claimant's right sided weakness was related to Claimant's earlier infarct, of which there are no direct records.  (R. 81-82.) The ME also noted that Claimant has a tobacco use disorder "which is extremely relevant to [his] cerebrovascular disease."  (R. 81.)

According to the ME, Claimant does not meet or equal any of the Listings because he saw no consistent evidence of pain, infrequent treatment visits, repeated negative neurological assessments, and little to no mention of a cane.  (R. 82-83.)  The ME also pointed to the results of the consultative examination in April 2012, which showed normal grip strength and manipulation abilities, and only a "very mild reduction in right arm strength" and right lower leg strength.  (R. 83-84.)  The ME was impressed that Claimant could walk on his toes and heels, tandem walk, hop on one leg and rise from squatting without any difficulties noted.  (R. 84.)  Claimant's limp was also described as normal.  (*Id.*)  Given such abilities, the ME understood "why the diagnostic impression" was that Claimant had "no significant focal neurological deficit" and noted the inconsistency with Claimant's testimony.  (*Id.*)

As for Claimant's RFC, the ME generally concurred with the April 2012 RFC set forth by Dr. Hinchen allowing for light work.  (R. 84-85, 339-46.)  He did add his opinion that as a result of Claimant's weakness, he should avoid ladders, ropes or scaffolds; should be limited to frequent climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; and should avoid concentrated exposure to unprotected heights and moving machinery.  (R. 91-92.)  He did not believe that Claimant would have any limitations in the use of his right, dominant hand.  (R. 92.)

Upon questioning by Claimant's counsel, the ME acknowledged the notation by a Social Security Administration employee that Claimant had difficulty standing and walking and was observed walking with a cane.  (R. 85, 199.)  As for the results of the consultative exam, the ME again emphasized that Claimant's ability to tandem walk, heel/toe walk, and hop on one leg would imply that he could walk even more than fifty feet without his cane.  (R. 87.)  Further, the results of the consultative exam support the ME's opinion that Claimant does not actually need the cane to ambulate effectively.  (R. 88-89.)  The ME did not agree that a notation in the record of unsteady gait or complaints of weakness on one side would necessarily indicate that Claimant requires a cane.  (R. 89.)  Instead, the ME would expect to see "documented changes in Claimant's walking," which was not observed at the consultative exam.  (*Id.*)

### 3. Vocational Expert's Testimony

A vocational expert ("VE") also offered testimony at the hearing.  The VE first classified Claimant's past jobs under the Dictionary of Occupational Titles ("DOT") as a postal clerk sorter (unskilled and heavy as performed), a receptionist (unskilled and sedentary), and a bus driver (semi-skilled and light as performed).  (R. 92-93.)  Next, the ALJ asked the VE to consider an individual of Claimant's age, education, and experience, who could occasionally lift and carry twenty pounds, frequently ten; could stand, walk, and sit for six hours in an eight-hour day; could frequently climb short ramps or stairs, stoop, crouch, kneel, crawl, and balance; but who must avoid ladders, ropes, scaffolds, and exposure to unprotected heights, moving machinery, and uneven surfaces.  (R. 93-94.)  When asked what jobs such an individual could perform, the VE

opined that he could perform light, unskilled work as a receptionist, food prep worker, or courier.  (R. 94.)

Next, the ALJ further limited the hypothetical individual to one who could occasionally lift ten pounds, frequently less than ten; requires a cane to ambulate; and can engage in only frequent fine and gross manipulation with the right dominant hand. (R. 94.)  The VE opined that such an individual could work in the sedentary, unskilled positions of order taker, receptionist, or general office clerk.  (R. 95.)

Claimant's counsel then asked the VE to further limit the hypothetical individual to one who has to walk at a slower pace.  (R. 95-96.)  The VE stated that his opinion about available jobs would not change so long as the individual could perform at a steady, slow pace.  (R. 96.)  If one removed the slower pace limitation, but limited the individual to only occasional use of the dominant right hand, the VE would eliminate the order taker position and the general office clerk position he previously identified.  (*Id.*) He would reduce (but not eliminate) the available sedentary receptionist jobs (3100) by 20%.  (*Id.*)  Lastly, the VE explained his answer would remain the same for an individual who was limited to only occasional manipulation bilaterally.  (R. 96-97.)

## II.    ANALYSIS

### A.    Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error.  42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28

L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (citing *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the ALJ's decision stand "if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (quoting *Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate his assessment of the evidence to assure us that [he] considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

## B.    Analysis under the Social Security Act

To qualify for DIB and SSI, a claimant must be under a disability within the meaning of the Act. 42 U.S.C. § 423(a)(1)(E). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Pursuant to the Act, a claimant is disabled only if his physical or mental impairments are of such severity that he is unable to do his previous work and cannot, when "considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless

of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether a claimant is disabled. 20 C.F.R. § 404.1520(a). The ALJ is required to make the following inquiries:

1.    Is the claimant presently engaging in substantial gainful activity?

2.    Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?

3.    Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? *See* 20 C.F.R. § Pt. 404, Subpt. P, App. 1.

4.    Is the claimant unable to perform his or her former occupation?

5.    Is the claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995). The claimant has the burden of establishing steps one through four. At step five, the burden shifts to the SSA to establish that the claimant is capable of performing work. *Clifford*, 227 F.3d at 868.

Here, the ALJ applied the five step analysis. At step one, he determined that Claimant had not engaged in substantial gainful activity since the alleged onset date of September 4, 2011. (R. 26.) At step two, the ALJ found that Claimant suffered from the following severe impairments: status-post two cerebrovascular accidents, in 2009 and 2011, and hypertension. (R. 26-27.) Next, at step three, the ALJ concluded that

Claimant did not have an impairment of combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § Pt. 404, Subpt. P, App. 1. (R. 27.) Specifically, the ALJ ruled out the Listings relevant to the cardiovascular system and Listing 11.04, covering "vascular insult to the brain." (*Id.*)

The ALJ went on to assess Claimant's RFC, ultimately concluding that Claimant could perform light work as defined in the regulations, in that Claimant could lift twenty pounds occasionally and ten pounds frequently, with no additional limitations in the ability to push or pull; could stand, walk, or sit for six hours in an eight-hour day; could frequently climb ramps and stairs, stoop, crouch, kneel, crawl, and balance. (R. 27.) Claimant would, however, be unable to climb ladders, ropes, or scaffolds, and must avoid uneven surfaces, and concentrated exposure to hazards. (*Id.*) In reaching this conclusion, the ALJ reviewed Claimant's seemingly benign medical record and relied heavily on the opinion of the medical expert, among other things discussed in more detail below. (R. 27-32.)

Based on the RFC assessment, the ALJ concluded, at step four, that Claimant could perform his past relevant work as a receptionist. (R. 32-33.) As a result, he entered a finding of not disabled. (R. 33.)

Claimant now argues that the ALJ's decision must be reversed because (1) his RFC assessment was inconsistent with the evidence of record; (2) he violated the "treating physician rule" when he discredited the opinions of Dr. Rosenstein; (3) his credibility assessment was flawed; and (4) he mischaracterized Claimant's past relevant work at step four. The Court addresses each argument in turn below.

### C. The ALJ's Opinion is Supported by Substantial Evidence and Free from Error.

Claimant first takes issue with the ALJ's RFC assessment, arguing primarily that the ALJ's conclusion that Claimant could walk, sit, or stand for six hours in an eight-hour workday is "utterly inconsistent" with the evidence of record. The Court disagrees and concludes that the ALJ's RFC assessment is supported by the record and free from legal error.

The RFC is the most a claimant can still do despite any limitations. 20 C.F.R. § 404.1545(a)(1). In assessing a claimant's RFC, the ALJ will consider all of the relevant medical and other evidence in the record, including evidence of impairments that are not severe. *Id*; *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). The RFC assessment must contain a narrative discussion describing how the evidence supports the ALJ's conclusions and explaining why any medical source opinion was not adopted if the ALJ's RFC assessment conflicts with such an opinion. SSR 96-8p, 1996 WL 374184, at *7; *accord Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005). A court will uphold an ALJ's decision "if the evidence supports the decision and the ALJ explains his analysis of the evidence with enough detail and clarity to permit meaningful review." *Arnett v. Astrue*, 676 F.3d 586, 591-92 (7th Cir. 2012) (citing *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008)).

As discussed above, the ALJ here determined that Claimant could perform light work, in that he could lift twenty pounds occasionally and ten pounds frequently, with no additional limitations in the ability to push or pull; could stand, walk, or sit for six hours in an eight-hour day; frequently climb ramps and stairs, stoop, crouch, kneel, crawl, and balance. Additionally, Claimant would be unable to climb ladders, ropes, or scaffolds, and must avoid uneven surfaces, and concentrated exposure to hazards.

According to Claimant, the ALJ's RFC assessment is flawed because he did not properly account for Claimant's need for a cane. However, based on a review of the record, the ALJ's conclusion as to the RFC is supported by the evidence as a whole. In reaching his conclusion, the ALJ explained how he relied heavily on the testimony of the ME, who had reviewed almost all of the evidence of record and "cited to specific points in the record to support his assessment of the claimant's remaining functional capacity." (R. 32.) As for the use of the cane, the ME - and in turn the ALJ - were of the opinion that although the Claimant carries his cane with him, the benign results of various neurological examinations following his 2011 stroke were evidence of Claimant's ability to ambulate. Indeed, the ALJ repeatedly noted Claimant's physical capabilities at the consultative examination with Dr. Rana. The ME also pointed out that the contemporaneous notes from Claimant's 2011 stroke reflect that Claimant's neurological exam was negative.[2] Contrary to Claimant's assertion, the ALJ did not ignore the notations in the record or Claimant's allegations of the need for the cane, but instead determined that the evidence of record did not in fact support such a need. *Goble v. Astrue*, 385 Fed. Appx. 588, 593 (7th Cir. 2010) ("An ALJ is obligated to consider all relevant medical evidence and may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding."). We find no error in the ALJ's assessment of Claimant's cane usage as related to his RFC.

Claimant also takes issue with the ALJ's treatment of the opinions of Dr. Rosenstein who stated (1) in January 2012, that Claimant could not work due to "poor vision" and (2) in September 2014, that Claimant had required a cane since his stroke in

_____

[2] In fact, the 2011 discharge papers indicate that Claimant could "ambulate independently." (R. 388.)

2011.  However, the Court finds that the ALJ properly considered the opinions of Claimant's treating physician as required by the regulations.

Claimant is certainly correct that the opinion of a treating physician is afforded controlling weight if it is both "well-supported" by clinical and diagnostic evidence and "not inconsistent with the other substantial evidence" in the case record.  20 C.F.R. § 404.1527(c)(2); *see Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011).  Because of a treating doctor's "greater familiarity with the claimant's condition and circumstances," *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), an ALJ must "offer 'good reasons' for discounting a treating physician's opinion."  *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010) (citations omitted); *see also Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016).  Those reasons must be "supported by substantial evidence in the record; a contrary opinion of a non-examining source does not, by itself, suffice." *Gudgel,* 345 F.3d at 470.  Even where a treating physician's opinion is not given controlling weight, an ALJ must still determine what value the assessment does merit. *Scott*, 647 F.3d at 740; *Campbell*, 627 F.3d at 308.  In making that determination, the regulations require the ALJ to consider a variety of factors, including: (1) the nature and duration of the examining relationship; (2) the length and extent of the treatment relationship; (3) the extent to which medical evidence supports the opinion; (4) the degree to which the opinion is consistent with the entire record; (5) the physician's specialization if applicable; and (6) other factors which validate or contradict the opinion. 20 C.F.R. § 404.1527(c).

Here, the ALJ essentially discounted Dr. Rosenstein's opinion that Claimant could not work due to poor vision, according it only "slight weight."  (R. 31.)  In doing so,

the ALJ pointed out that within a month of Dr. Rosenstein's statement - which notably was not accompanied with any visual testing results - Claimant was examined by ophthalmologist Dr. Sidrys. Dr. Sidrys, "a specialist in the field," as the ALJ notes, opined that the Claimant had no visual limitations as long as he wore his glasses. (*Id.*) In this regard, the ALJ offered "good reasons" to discredit Dr. Rosenstein's opinion regarding his vision as it lacked support and was otherwise inconsistent with the evidence of record, including that of a specialist. *See* 20 C.F.R. § 404.1527(c)(5) ("We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist."); *see also Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (An ALJ's decision to give lesser weight to a treating physician's opinion is afforded great deference so long as the ALJ minimally articulates his reasons for doing so).

The ALJ also accorded only "slight weight" to Dr. Rosenstein's 2014 opinion that Claimant had required a cane since his 2011 stroke. (R. 31.) The ALJ reasoned that this opinion was primarily based on Claimant's own allegations and appeared "to be a sympathetic" opinion. *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (A treating doctor's opinion may be properly discounted if it is based upon the claimant's subjective complaints rather than objective medical evidence); *see also Labonne v. Astrue*, 341 Fed. Appx. 220, 224 (7th Cir. 2009) ("But an ALJ may reject a treating physician's opinion over doubts about the physician's impartiality, particularly since treating physicians can be overly sympathetic to their patients' disability claims."). The ALJ also pointed out that Claimant had only seen Dr. Rosenstein a couple of times in the three years following the 2011 stroke, which suggested that the treatment

relationship was not regular or frequent. More importantly, and as discussed above, throughout his opinion, the ALJ emphasized the contradictory evidence in the record suggesting that Claimant did not in fact require the cane to ambulate effectively. Collectively, these reasons amount to "good reasons" to discount Dr. Rosenstein's opinions.

In attacking the ALJ's opinion, Claimant also argues that he failed to properly assess his credibility because he relied too heavily on the objective medical evidence and his daily activities, among other things. The Court disagrees.

At the outset, we note that the SSA has recently updated its guidance about evaluating symptoms in disability claims. *See* SSR 16-3p, 2016 WL 1119029 (March 16, 2016). The new ruling eliminates the term "credibility" from the Administration's sub-regulatory policies to "clarify that subjective symptom evaluation is not an examination of the individual's character." *Id.* at *1. Though SSR 16-3p post-dates the ALJ's hearing in this case, the application of a new social security regulation to matters on appeal is appropriate where the new regulation is a clarification of, rather than a change to, existing law. *Pope v. Shalala*, 998 F.2d 473, 482-483 (7th Cir. 1993), overruled on other grounds by *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999). As before, under SSR 16-3p, the ALJ must carefully consider the entire case record and evaluate the "intensity and persistence of an individual's symptoms to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 16-3p, 2016 WL 1119029 at *2. In making a credibility determination, the ALJ "may not disregard subjective complaints merely because they are not fully supported by objective medical evidence." *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995). Rather, SSR 16-3p

requires the ALJ to consider the following factors in addition to the objective medical evidence: (1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the pain or other symptoms; (3) factors that precipitate and aggravate the symptoms, (4) the type, dosage, effectiveness and side effects of medication; (5) any treatment, other than medication, for relief of pain or other symptoms; (6) any measures the claimant uses to relieve the pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. SSR 16-3p, 2016 WL 1119029 at *7.

Here, the ALJ did rely in part on the lack of objective medical evidence supporting Claimant's allegations of limitations. He cited to somewhat infrequent treatment and the results of his various examinations as related to his ability to ambulate. As discussed above, the Court has already concluded that the ALJ properly considered such medical evidence when making his ultimate decision. More importantly, the ALJ did not stop with just a review of the objective medical evidence. He also commented on Claimant's daily activities, such as cooking, shopping and using public transportation independently. Contrary to Claimant's assertion, the Court does not agree that the ALJ found that such activities necessarily translated into an ability to maintain full time work. *See Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Instead, the ALJ properly considered those activities, and the record as a whole, and determined that the activities were inconsistent with Claimant's allegations of significant neurologic impairments. The Court does not find that the ALJ's assessment in this regard was "patently wrong." *Craft*, 539 F.3d at 678 ("We overturn a credibility determination only if it is patently wrong.").

Lastly, Claimant argues curtly that the ALJ erred at step four when he found that Claimant could perform his past work as a "receptionist" based on the VE's testimony. According to Claimant, his past work at the hospital amounted to a switchboard operator, which is "clearly not the same thing as a receptionist." (Pl.'s Mem. at 15.) Despite this strong statement, Claimant provides no specific discrepancies between the switchboard position he deems appropriate and the receptionist position contemplated by the VE, and in turn the ALJ. Because perfunctory and undeveloped arguments are considered waived, we need not comment further on this issue. *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003). Further, as the Commissioner points out, Claimant's counsel made no objection at the hearing to the VE's classification of Claimant's past work. Further, Claimant has not attempted to now argue in his briefs that any conflict between the DOT and the VE's testimony was "so obvious that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).

On the whole, the Court finds that the ALJ properly examined the record and reached a decision that is substantially supported by the evidence and free from legal error.

## III.    CONCLUSION

For the foregoing reasons, Claimant's motion for summary judgment is denied and the Commissioner's motion for summary judgment is granted. The decision of the ALJ is affirmed. It is so ordered.

_____
**Michael T. Mason**
**United States Magistrate Judge**

**Dated: May 10, 2017**

23